Union Bank of Chicago, Appellee, v. Leo F. Wormser, Trustee et al., Appellees.
Appeal of Ruth S. Van Ness, Appellant.

Gen. No. 33,561.

292

Opinion filed March 5, 1930. Rehearing denied March 31, 1930.

ELMER M. LEESMAN and JOHN E. OWENS, for appellant.

LESSING ROSENTHAL, F. HOWARD ELDRIDGE and WILLARD L. KING, for appellee LEO. F. WORMSER; ISAAC S. ROTHSCHILD, for certain other appellees.

MR. JUSTICE RYNER delivered the opinion of the court.

The principal issue presented by this appeal is whether the defendant, Ruth S. Van Ness, formerly Ruth S. Mayer, by the signing of a certain letter,

created a valid irrevocable trust. The letter reads as follows:

"Chicago, June 8, 1923.

Mr. Leo F. Wormser,
105 W. Monroe Street,
Chicago.

Dear Leo:

You have in your firm's trust account $1,747.59 belonging to me and I have just endorsed check of The Mutual Benefit Life Insurance Company for $22,676.64, to be deposited in the same account, making a total of $24,424.23.

Of this sum, I desire to have you invest $22,000 and to retain the securities in trust, the entire income, during my lifetime, to be paid to me, and upon my death, when the youngest child of mine me surviving attains twenty-one years of age, the entire trust fund shall be divided equally between the then living children and the issue of any then deceased child of mine, that is to say, such issue shall take the share which my deceased child (the parent of such issue) would have taken if living.

Whatever formal instrument may be needed to effect this trust can be drawn when you return from Washington.

The balance of $2,424.23 may temporarily remain in your firm's trust account, with the privilege on your part to pay out such sums as may be owing, for fees or disbursements, to Edgar M. Johnson or your firm in connection with Millard's estate or the insurance moneys, and the privilege on my part to withdraw the entire balance at any time or from time to time, as I may see fit.

Very truly yours,
Ruth S. Mayer."

Ruth S. Van Ness is a daughter of Charles Shaffner, of Chicago. She obtained a decree of divorce from her husband, E. Millard Mayer, of Cincinnati, Ohio, on

February 16, 1923, and was awarded the custody of their three minor children. Subsequent to the signing of the letter of June 8, 1923, she became the wife of Louis H. Van Ness. Mayer died suddenly on March 10, 1923. He left certain policies of insurance upon his life which designated Mrs. Van Ness as the beneficiary, under the name of Ruth S. Mayer, wife of the assured.

Leo F. Wormser is a member of the law firm of Rosenthal, Hamill and Wormser. He represented Mrs. Van Ness in her divorce proceedings. He had also acted as the attorney for her father for a number of years.

The funds mentioned in the letter of June 8, 1923, constituted the principal portion of the proceeds of the life insurance policies. Mayer left nothing else to provide for the support of his children and divorced wife. Mrs. Van Ness testified that, at the time of the death of her husband, she had no money or assets of any kind but was dependent upon an allowance given her by her father.

Correspondence passing between the attorney for Mayer's father and Wormser discloses that a question arose about the rights of the creditors of Mayer, in a bankruptcy proceeding in Ohio, to have their claims paid out of the proceeds of the insurance policies, and that Mayer's father made what he termed an equitable claim that he was entitled to be reimbursed for approximately $3,700, which he had advanced on account of premiums on the insurance policies.

The matter of the claims of creditors was finally adjusted and Mayer relinquished any claims he had, upon the understanding expressed in the letter of his attorney to Wormser, dated April 5, 1923, which reads as follows:

"I have heard nothing from you regarding Mayer's suggestion that anything which may be collected from the insurance companies or received from the estate,

be placed in trust, Ruth to have the income for life and the principal to go to her children after her death.''

On June 5, 1923, Wormser replied, by letter, in which he stated that Mrs. Van Ness was coming to his office the following day and that he was going to suggest to her the wisdom of placing the proceeds of the insurance policies in trust for the benefit of her children.

In the interim between the dates of the two letters, Wormser, according to his testimony, had several conferences with Mrs. Van Ness with reference to the creation of a trust. He said that at first she displayed resentment of any suggestion coming from Mayer but that he advised her that the real question was the merit of the proposal and not its source.

Wormser also testified that on June 8, 1923, Mrs. Van Ness, then Mrs. Mayer, came to his office and indorsed a check from the Mutual Benefit Life Insurance Company for the sum of $22,676.64; that he read to her a copy of his letter to the attorney for Mayer, dated June 5, 1923, and discussed with her the proposed arrangement; that he advised her that her father had said that during the time she continued to live with him or her brother, in Chicago, he would provide for the maintenance of herself and children and that he favored the suggestion made by Mayer.

He further testified that, on the same occasion, he said that her divorced husband had been an extravagant and reckless man with respect to financial matters and had left nothing for his children; that he thought it to be for the best interest of herself and children to put the money beyond her own reach and to put it where she would get the income, so that the corpus would be conserved during her life and be available for the children when they attained majority after her death. He also said that he advised her that she had better give the matter further consideration, but that she replied that they had been discussing the subject for two months, and that she had heard

all she wanted to hear about the "old money" and was ready to act. He stated further that he showed her a copy of her divorced husband's will, which showed that he intended to create a trust for his children; that he told her that she was without experience in handling money and that she should not leave herself in a position where she would be tempted to use any of the principal of the funds.

It is undisputed that the instrument in question was prepared by Wormser and read and signed by Mrs. Van Ness on the date it bears. The entire transaction took place in his office.

It appears from the testimony of Wormser that from June 8, 1923 to June 10, 1924, she received the income from the alleged trust fund without raising any question as to her right to revoke the agreement she made; that on the latter date she requested that sufficient of the securities in the fund be sold so that she could invest $5,000 in a farm and $15,000 in a business conducted by the Federal Gauge Company. Louis H. Van Ness was president of that company. Whether he was then or subsequently married to Mrs. Van Ness does not appear of record. Wormser declined to comply with her request, giving as a reason therefor that he did not consider either proposed investment a sound one.

Under date of June 11, 1924, Mrs. Van Ness wrote a letter to Wormser, the tenor of which was that "In creating the trust fund for the children" she was in no way under the impression that the money was passing completely beyond her control, or that the document in question, was irrevocable, or that the investments could not be changed if she so desired. The letter concluded with the following:

"But I should never have dreamed of tying up the money so as to make it impossible for me to reinvest it. My only idea in creating the trust was to leave this particular form of property to my children at my

death, as it came from their father, instead of leaving it in my own name and making a will, which is what I should have done apparently. Unfortunately I was ignorant of the technicalities of trust funds and did not understand it to be as binding then as you described it yesterday.

"Will you please have copies mailed to me at once of the trust and the list of securities, both of which I have mislaid. I am very anxious to obtain a clearer understanding of this matter immediately, and would, therefore appreciate an immediate answer.

Very sincerely,
Ruth Mayer."

On February 27, 1925, Wormser wrote to Mrs. Van Ness, suggesting that, since the duration of the trust would probably exceed his own life, the trust be transferred to a trust company. Six months later Mrs. Van Ness designated the Union Bank of Chicago as the trust company of her husband's choice. Wormser then prepared a trust agreement to be executed by Mrs. Van Ness and the bank. The document was approved by Ellis, who was then her attorney. The agreement, together with the securities in question, and the resignation of Wormser, as trustee, were deposited with the bank. Mrs. Van Ness refused to execute the agreement and, through another attorney, demanded possession of the securities as her own personal property. Wormser was asked to consent to this but refused so to do.

On July 2, 1926, the Union Bank of Chicago filed its bill of interpleader, making Mrs. Van Ness and Wormser parties defendant. A hearing was had, resulting in a decree of the court adjudicating that the document executed by Mrs. Van Ness on June 8, 1923, constituted a valid and irrevocable trust.

Mrs. Van Ness testified that she told Wormser that she wished the money invested so that it would certainly go to her children in case she should die suddenly; that when Wormser refused to make a change

in the investment, requested by her, she expressed surprise and told him that she did not understand that she could not make investments as she chose, or that the money had gone beyond her "personal jurisdiction".

She further testified that she read the letter of June 8, 1923 before she signed it, and that the language contained in it meant to her "exactly what the words implied." When the chancellor asked her what meaning she gave to the words in the letter, "Whatever formal instrument may be needed to effect this trust can be drawn when you return from Washington," she replied that

"It meant something that merely embodied—well, or any other sort of thing that had a legal stamp on it, so that should I be out of the way in a hurry someone could not say it was not legal and valid."

In rebuttal she testified that she was in error when she said that she signed the letter of June 8, 1923, at her home, and that her memory had been considerably refreshed by hearing the testimony of Wormser; that her father had implored her not to marry her first husband and that, being an old-fashioned man he disapproved strongly of her obtaining a divorce; that her father did not approve of a young person indulging in any pleasure or doing anything "except sitting at home and folding one's hands"; that she had to do as her father told her and that he thought it best to have the money "tied up", and that she remembered how her father "deviled" her about the matter a great deal, as did also her brother, with whom she was living.

When her counsel asked her if that (evidently referring to the testimony she had just given) had anything to do with her signing the letter, in question she replied:

"I cannot say it had anything to do with my signing that letter. I must have at that time felt it was necessary for me to do as my father wished."

The chancellor then asked her: "If that be true, then you must have had some idea of the character of the obligation into which you were entering when you signed it?" She replied: "I did, but I did not to the extent—it did not occur to me, did not enter by mind as to whether or not I could change it. I really was to do something that my father told me. My mind was rather distraught at the time, and if my memory has not been very clear, Mr. Wormser has refreshed it considerably. I knew that in any event I should receive the money. I had absolute confidence in Mr. Wormser and in my father. I knew it belonged to me and I would get it, but I knew my father would be very unpleasant to deal with if I did not do as he pleased in that. In fact, that was always the way I had to do, as he pleased, or I had to suffer the consequences."

Counsel for Mrs. Van Ness first urged as a ground for the reversal of the decree of the trial court that, if the letter of June 8, 1923, by its terms, created a trust, the chancellor should have set it aside under the circumstances surrounding its execution. They contend that she signed the document under stress of fear of displeasing her father if she did otherwise, and that Wormser having acted as the attorney for the father for a number of years, his suggestions or advice were the same as if made or given by her father.

In support of this contention, counsel cite the cases of *McLaughlin v. McLaughlin,* 241 Ill. 366, and *Tanner v. Tanner,* 326 Ill. 302. In the former case the Supreme Court of this State said:

"In the case of a deed from a child to a parent the presumption of undue influence arises as a matter of law, but in case of a deed from a parent to a child, no such presumption of law arises."

In the second case it appeared that a mother possessed a dominating influence over her 21-year-old son who was living with her and who said, in reference to

the division of certain property, that he would be satisfied with a pigpen if his mother gave it to him. His father had died leaving a will. By virtue of an agreement and a parol partition, the mother received a much larger portion of the estate than she was entitled to under the will. The court, in stating the rule applicable to such a state of facts, said:

"When two persons stand in such relationship that confidence is necessarily reposed by one in the other, and the influence which naturally grows out of that confidence is abused while such confidence continues, or an advantage is obtained by reason of such influence over the confiding party, the person seeking such advantage will not be permitted to retain the same although the transaction could not have been impeached if no such confidential relation had existed."

We do not consider either case applicable to the facts in the instant case. Mrs. Van Ness was 28 years of age when she testified. Prior to her second marriage she had been married and divorced, both acts being over the vigorous protests of her father, according to her own testimony.

It is clear that in respect to these matters she was not dominated by the will of her father. Neither grandparent derived any financial benefit from the transaction. In fact just the contrary was true. The paternal grandfather relinquished any claim to be reimbursed for moneys paid on account of premiums on the insurance policies. The father of Mrs. Van Ness was supporting her and her children, and he expressed a willingness to continue so to do as long as she remained in Chicago. The grandparents were making financial concessions to induce her to do what she should have done, without suggestion from anybody, i.e., to conserve the corpus of all that she possessed in the world for the benefit of her minor children.

Counsel place great reliance upon the case of *Finucan v. Kendig,* 109 Ill. 198. They quote from it in their brief as follows:

"Appellants' counsel have, in their argument, gone very elaborately into the doctrine of the court of chancery on the subject of voluntary settlements, in the particular of there being the absence of a power of revocation in such a settlement, citing very many English authorities upon the subject, in some of which may be found remarks going quite far in the direction that a power of revocation ought to be inserted in such a settlement, or the settler should have been advised that there should be a power of revocation inserted in it; but we think the conclusion to be drawn from all the authorities is, that there is no such rule that the want of a power of revocation in a voluntary settlement, or the want of advice as to the insertion of such a power, will afford ground, in equity, for the donor to set aside such a settlement, but that the same is a circumstance, and a circumstance merely, to be taken into account in determining upon the validity of the settlement, and of more or less weight, according to the facts of each particular case. See *Toker v. Toker,* 3 DeG. J. & S. 487; *Hall v. Hall,* L. R. 8 Ch. App. 437; *Bill v. Cureton,* 2 Mylne & Keene, 503; *Petre v. Espinasse,* id. 496; *Kekewich v. Manning,* 1 DeG. M. & G. 176; *Jenkins v. Pye,* 12 Pet. 241."

The case is in fact adverse to the contentions of counsel because it holds "that there is no such rule that the want of a power of revocation in a voluntary settlement, or the want of advice as to the insertion of such a power, will afford ground, in equity, for the donor to set aside such a settlement, but that the same is a circumstance, and a circumstance merely, to be taken into account in determining upon the validity of the settlement, and of more or less weight, according to the facts of the particular case."

If a woman, of mature age, is advised by her attorney to place certain funds beyond her reach and in a place where she would not be tempted to use any of the principal, so that the corpus would be conserved for the benefit of her minor children, and she accepts the suggestion by the execution of a formal document, the insertion of a clause giving a power of revocation would thwart the very purpose of the undertaking. Mrs. Van Ness does not directly deny that Wormser did so advise her.

A number of reasons are advanced to show that the letter of June 8, 1923, was not, by its terms, creative of a trust. It is argued that no trustee is designated and that the instrument is incomplete on its face in that the language used assumes the death of Mrs. Van Ness simultaneously with the attainment of 21-years of age of her youngest surviving child. These points are wholly without merit. Again it is urged that the letter shows that a more formal instrument was to be prepared because of the language:

"Whatever formal instrument may be needed to effect this trust can be drawn when you return from Washington."

We cannot agree with this contention. No formal instrument was needed to effect the trust created. She never demanded a more formal trust indenture and until one was prepared and executed she must have intended that the letter remain in full force and effect. In fact when she was requested to execute a trust agreement with the Union Bank of Chicago, which had been approved by her attorney, she refused.

Complaint is made because attorney's fees were allowed to Wormser for legal services rendered, at his instance, by members of his firm. The chancellor found that, in preserving and defending the trust estate, it became necessary to employ counsel. With this finding we agree. We cannot think of any good reason

why he should not have employed members of his own firm in whom he is presumed to have reposed the utmost confidence. Neither do we think that the fees allowed were excessive.

It is next contended that the chancellor erred in finding that Wormser, rather than his firm, was the trustee appointed by the instrument of June 8, 1923. This position is untenable. The mere fact that Wormser used the facilities of the firm in making investments, collecting dividends, and issuing checks did not and could not constitute the firm trustees.

Counsel also say that the chancellor erred in directing Wormser to defend this appeal. If he had been unsuccessful in sustaining his position in the trial court the chancellor might well have hesitated in giving him such authority, particularly if he was to be reimbursed for expenses and solicitor's fees out of the funds in controversy. If he had the right to defend and preserve the trust in the trial court, and was there successful in sustaining the trust, as he was, we preceive no reason why he should not be authorized to pursue the same course in this court.

Counsel in support of their contention that the court erred in allowing the payment of the guardian *ad litem's* fees out of the trust estate, cite *Hutchinson v. Hutchinson,* 152 Ill. 347 and *Gagnon v. Burton,* 107 Ill. App. 506. Neither case is in point. In each case the trial court taxed the solicitor's fees for the guardian *ad litem* as costs against the complainant in the suit. In the instant case the fees were ordered to be paid out of the trust estate.

We have examined the testimony of Isaac S. Rothschild, the guardian *ad litem.* He has been a practicing attorney at the Chicago Bar for over 30 years. He did not merely render the perfunctory service of filing the usual, formal answer on behalf of the minors, but rendered services as an attorney. The allowance made

to him, in view of the services rendered, was not excessive.

Finally it is urged that the trial court erred in directing the guardian *ad litem* to defend this appeal. From time immemorial minors have been considered wards of the State and entitled to protection in courts of chancery where their custody or property rights are involved. The court owes the duty to see to it that they are properly represented and their rights carefully safeguarded. In the instant case the interests of the minors were in the trial court and are here adverse to that of their mother. They were entitled to representation from the inception of the litigation until its final culmination. This included the right to be represented in connection with the various steps to be taken in perfecting this appeal. The contention is unsound.

For the foregoing reasons the decree of the circuit court of Cook county is affirmed.

*Decree affirmed.*

WILSON, P. J., and HOLDOM, J., concur.